**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and MARICOPA AUDUBON SOCIETY,<br><br>        Plaintiffs,<br><br>v.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. Department of Justice; and DALE HALL, Director, U.S. Fish and Wildlife Service,<br><br>        Defendants. | No. CV 07-0038-PHX-MHM<br><br>**ORDER** |

Currently before the Court are Plaintiffs Center for Biological Diversity and Maricopa Audubon Society's ("Plaintiffs") motion for summary judgment (Dkt. #28); and Defendants Dirk Kempthorne and Dale Hall's ("Defendants") cross-motion for summary judgment (Dkt. #36). Also before the Court are the San Carlos Apache Tribe, Yavapai-Apache Nation, Tonto Apache Tribe, Fort McDowell Yavapai Nation, and Salt River Pima-Maricopa Indian Community's (collectively, the "Amici Curiae") motions for leave to file amicus curiae briefs. (Dkt. #s 47, 49, 51). Plaintiffs challenge the United States Fish & Wildlife Service's ("FWS") August 30, 2006 finding denying Plaintiffs' petition to define the bald eagle population of the Sonoran Desert region of the American southwest ("Desert bald eagle") as a distinct population segment ("DPS") and to list the Desert bald eagle as "endangered" pursuant to the Endangered Species Act ("ESA").

1  Defendants counter that the FWS's July 9, 2007 final delisting rule moots Plaintiffs'

2  challenge to the FWS's August 30, 2006 finding, and in the alternative, the FWS's

3  August 30, 2006 finding was reasonable.  After careful consideration of the pleadings and

4  the administrative record, and after holding oral argument on February 5, 2008, the Court

5  issues the following Order.

6  **I.    FACTUAL BACKGROUND**

7         Desert bald eagles are a discrete population of bald eagles that nest in the Sonoran

8  Desert in central Arizona and northwestern Mexico.  Administrative Record ("AR")

9  3538, 3731.  They represent the entire bald eagle population known to breed in the

10  Southwestern United States, and they demonstrate unique behavioral characteristics in

11  contrast to the greater population of bald eagles in the contiguous 48 states.  AR 5898-99;

12  AR 6408.  Desert bald eagles inhabit a desert ecological setting, a desert riparian habitat

13  that is drier, warmer, and less vegetated than is typical for the bald eagle species.  AR

14  3539, 3594; AR 4142.  They breed in upper and lower Sonoran life zones; and they are

15  smaller and lighter than most other bald eagles.  AR 3542, 3594.  Desert bald eagles also

16  possess behavioral distinctions, such as frequent cliff nesting and early season breeding.

17  AR 3541, 3595-96; AR 6165, 6408.  In addition, Desert bald eagles are reproductively

18  isolated, and perhaps genetically distinct, from other bald eagle populations.  AR 3542,

19  3596-98; AR 3542.  Indeed, "[b]ecause of the limited distribution and small size of the

20  Southwest bald eagle population, its geographic location and relative isolation, and the

21  unique ecological conditions to which it has adapted, this population is both unique and

22  important."  AR 5899.

23         In 2005, estimates by the Arizona Game and Fish Department ("AGFD") indicated

24  that there were 36 active breeding pairs in the Desert bald eagle population.  AR 3972.

25  Desert bald eagles suffer from high mortality rates and low productivity, and their small

26  population size and reproductive isolation make them vulnerable to loss of genetic

27  variability, which in turn can precipitate population decline.  AR 3583, 3607-11, 3792,

28  3809-11, 4069; AR 3549-51, 3605-07.  Desert bald eagles also face a number of external

threats such as habitat loss due to human development, loss of riparian trees and snags, recreational disturbance, declining prey base, grazing, water diversions, dams, and mining.  AR 3545-46, 3550-53.  Moreover, a recent population viability study conducted by the Center for Biological Diversity concludes that without continued and concerted protection, the Desert bald eagle population may become extinct in approximately 75 years.  (Dkt. #33, Ex. B).

**II.    REGULATORY & PROCEDURAL HISTORY**

The Bald Eagle was first listed as an endangered species pursuant to the Endangered Species Act ("ESA") on February 14, 1978[1].  AR 6560; 72 Fed. Reg. 6230 (Feb. 14, 1978).  The primary goal of the ESA is to restore endangered and threatened animals and plants to the point where they are again viable, self-sustaining members of their ecosystems.  AR 5992.  The U.S. Fish and Wildlife Service ("FWS") administers the ESA with respect to freshwater fish and all other species, including the Bald Eagle.

Section 4(f) of the ESA provides for the development and implementation of recovery plans for listed species to identify, describe, and schedule the actions necessary to restore endangered and threatened species to a more secure condition.  AR 5992.  The FWS established five recovery regions for the Bald Eagle, including one for the southwestern corner of the United States (consisting of Arizona, the area of California bordering the Lower Colorado River, New Mexico, Oklahoma, and Texas west of the 100th Meridian).  AR 5992, 5813.

On July 12, 1995, the FWS reclassified the Bald Eagle from "endangered" to "threatened."  60 Fed. Reg. 36,000 (July 12, 1995); AR 5990-91.  At that time, the FWS declared that it recognized "only one population of bald eagles in the lower 48 States," because Desert bald eagles "are not reproductively isolated."  AR 5994, 5995.  However, the FWS has since changed its mind, stating that data indicating that no bald eagles have

---

[1]The Bald Eagle was listed as endangered in 43 states, and as threatened in the States of Michigan, Minnesota, Wisconsin, Oregon, and Washington.

1   immigrated to, and only one eagle has emigrated from, the Desert bald eagle population

2   establishes that "the Sonoran Desert bald eagle population [is] discrete from other bald

3   eagle populations." AR 3543; 72 Fed. Reg. 37346, 37355 (July 9, 2007).

4        On October 6, 2004, Plaintiffs petitioned the FWS to define the Desert bald eagle

5   as a distinct population segment ("DPS") and to then list that DPS as "endangered"

6   pursuant to the ESA. AR 3578-93. Subsequently, on March 27, 2006, Plaintiffs filed a

7   lawsuit against the U.S. Department of the Interior and the FWS for failing to make a

8   timely finding on Plaintiffs' petition. AR 3538. The parties reached a settlement and the

9   FWS agreed to complete its finding by August 2006. AR 3200, 3268, 3751-56.

10       On August 30, 2006, the FWS issued a negative 90-day finding that Plaintiffs'

11  petition "[did] not present substantial scientific or commercial information indicating that

12  the petitioned action may be warranted." 71 Fed. Reg. 51,549; 51,551 (Aug. 30, 2006);

13  AR 3538. As such, the FWS did not initiate a status review of the Desert bald eagle to

14  determine whether listing the Desert eagle population as a DPS is in fact warranted. AR

15  3554. And on January 5, 2007, Plaintiffs brought the instant action challenging the

16  FWS's August 30, 2006 negative 90-day finding. (Complaint, Dkt. #1).

17  **III.   DISCUSSION**

18       Plaintiffs contend that the FWS's August 30, 2006 finding violates the Endangered

19  Species Act ("ESA") and is arbitrary and capricious under the Administrative Procedure

20  Act ("APA"), 5 U.S.C. §706. Defendants, on the other hand, contend that Plaintiffs'

21  challenge to the FWS's August 30, 2006 finding is moot due to the FWS's July 9, 2007

22  final delisting rule, and in the alternative, the FWS's August 30, 2006 finding did not

23  violate the ESA and was reasonable under the APA.

24       **A.  Standard of Review**

25       "The [APA] governs judicial review of administrative decisions involving the

26  Endangered Species Act." Aluminum Co. of America v. Bonneville Power Admin., 175

27  F.3d 1156, 1160 (9th Cir. 1999). Where a court conducts judicial review pursuant to the

28  APA, "summary judgment is an appropriate mechanism for deciding the legal question of

1    whether the agency could reasonably have found the facts as it did."  Occidental

2    Engineering Co. v. Immigration and Naturalization Service, 753 F.2d 766, 770 (9th Cir.

3    1985).  Under the APA, 5 U.S.C. §702, an aggrieved party may sue to set aside a final

4    non-discretionary agency action that is arbitrary or capricious, an abuse of discretion, or

5    otherwise not in accordance with the law.  Mt Graham Red Squirrel v. Espy, 986 F.2d

6    1568, 1571 (9th Cir. 1993).

7         An agency action is arbitrary and capricious "if the agency has relied on factors

8    which Congress has not intended it to consider, entirely failed to consider an important

9    aspect of the problem, offered an explanation for its decision that runs counter to the

10   evidence before the agency, or is so implausible that it could not be ascribed to a

11   difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of

12   U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  "The arbitrary and

13   capricious standard is 'highly deferential, presuming the agency action to be valid and

14   [requires] affirming the agency action if a reasonable basis exists for its decision.'"  Kern

15   County Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting Indep.

16   Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000)).  Review under this

17   standard is "exacting, yet limited"; a court "may not substitute [its] judgment for that of

18   the agency."  Id.  Deference is especially appropriate where the challenged decision

19   implicates substantial expertise.  Ninilchik Traditional Council v. United States, 227 F.3d

20   1186, 1194 (9th Cir. 2000).

21        Nevertheless, "the agency must examine the relevant data and articulate a

22   satisfactory explanation for its action including a 'rational connection between the facts

23   found and the choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43 (quoting

24   Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  A reviewing court

25   "must not rubber-stamp . . . administrative decisions that [the court deems] inconsistent

26   with a statutory mandate or that frustrate the congressional policy underlying a statute."

27   Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 859 (9th Cir. 2005).

28

1

**B.  Statutory Framework**

2       The ESA's substantive protections for a species and its habitat are triggered only if

3    the FWS formally lists a species as either "endangered" or "threatened" pursuant to the

4    ESA.  16 U.S.C. §1533; 50 C.F.R. §402.12(d).  An "endangered species" is "any species

5    which is in danger of extinction throughout all or a significant portion of its range."  16

6    U.S.C. §1532(6).  A "threatened species" is "any species that is likely to become an

7    endangered species within the foreseeable future throughout all or a significant portion of

8    its range."  16 U.S.C. §1532(20).  In addition, the ESA defines "species" to include any

9    "distinct population segment of any species."  16 U.S.C. §1532(16).  ESA listing

10   determinations must rely on the best scientific and commercial data available; at no point

11   may the FWS consider political and economic factors.  16 U.S.C. §1533(b)(1)(A).

12      Any interested person may file a petition with the Secretary of the Interior to list a

13   species as threatened or endangered under the ESA.  16 U.S.C. §1533(b)(3)(A); 50 C.F.R.

14   424.14(a).  On receipt of a petition, the FWS must review the petition and, "to the

15   maximum extent practicable," within 90 days make a finding as to whether the petition

16   presents "substantial scientific or commercial information indicating that the petitioned

17   action may be warranted" (commonly referred to as a "90-day finding").  16 U.S.C.

18   §1533(b)(3)(A); 50 C.F.R. §424.14(b).  ESA regulations define "substantial information"

19   as "the amount of information that would lead a reasonable person to believe that the

20   measure proposed in the petition may be warranted."  50 C.F.R. §424.14(b).

21      In making its 90-day finding, the FWS must consider whether the petition: (1)

22   clearly indicates the administrative measure recommended and gives scientific and

23   common name of the species involved; (2) contains detailed narrative justification for the

24   recommended measure, describing, based on available information, past and present

25   numbers and distribution of the species involved and any threats faced by the species; (3)

26   provides information on the status of the species overall or a significant portion of its

27   range; and (4) is accompanied by appropriate supporting documentation in the form of

28

1   bibliographic references, reprints of pertinent publications, copies of reports or letters

2   from authorities, and maps.  40 C.F.R. §414.14(b)(2).

3          If the FWS concludes in its 90-day finding that the petition does not present

4   substantial information indicating that a petitioned listing may be warranted (commonly

5   referred to as a "negative 90-day finding"), then the FWS must publish the finding in the

6   Federal Register; and at that time the administrative listing process is complete.  16

7   U.S.C. §1533(b)(3)(A).  A negative 90-day finding may be challenged in federal court.

8   16 U.S.C. §1533(b)(3)(C)(ii).

9          Alternatively, if the FWS concludes in its 90-day finding that the petition does

10  present "substantial information" indicating that the listing may be warranted (commonly

11  referred to as a "positive 90-day finding"), then the FWS must publish the finding in the

12  Federal Register and conduct a "review of the status of the species concerned" in order to

13  determine whether listing the species as a DPS is "warranted" (commonly referred to as a

14  "status review").  16 U.S.C. §1533(b)(3)(B).  In conducting a status review, the FWS

15  "shall consult as appropriate with affected States, interested persons and organizations,

16  other affected Federal agencies."  50 C.F.R. §424.13.  In addition, FWS guidelines

17  reiterate this requirement by stating that the FWS "must conduct the [status] review after

18  soliciting comments from the public by publishing a notice in the Federal Register and

19  notifying State, Tribal, and Federal officials and other interested parties of the need for

20  information."  FWS Petition Management Guidance, p.9

21  (http://www.nmfs.noaa.gov/pr/pdfs/laws/petition_management.pdf).

22         After the status review and within 12 months of the receipt of the petition, the

23  FWS must determine whether listing of the species is "warranted," "not warranted," or

24  "warranted, but" precluded by other listing priorities (commonly referred to as a "12-

25  month finding").  16 U.S.C. §1533(b)(3)(B).  If the FWS determines on completion of its

26  status review that listing of the species as a DPS is "warranted," then it must publish a

27  proposed listing rule in the Federal Register and solicit public comment.  16 U.S.C.

28  §1533(b)(5).  Then, within 12 months of publishing the proposed rule, and after

1  considering public comment and all relevant evidence, the FWS must make a final

2  decision whether to formally adopt the proposed listing rule.  16 U.S.C. §1533(b)(6).

3  **C.  Mootness**

4  On July 6, 1999, the FWS published a proposed rule to delist the entire bald eagle

5  population throughout the contiguous 48 states and sought public comment on the

6  proposed rule.  AR 6163-64.  On February 16, 2006, the FWS reopened the public

7  comment period on the FWS's 1999 proposed delisting rule.  AR 6558.  At that time, the

8  FWS stated that it "need not at this time analyze whether any particular geographic area

9  would constitute a DPS pursuant to [the FWS's] DPS policy."  AR 6564.

10  On May 16, 2006, the comment period for the delisting proposal was again

11  extended, and the FWS made no mention of whether it was reviewing the status of bald

12  eagles in any particular geographic area to determine whether they constituted a distinct

13  population segment ("DPS").  71 Fed. Reg. 28293.  Nonetheless, on June 19, 2006, the

14  Center for Biological Diversity, the Sierra Club, Portland Audubon Society, Raptor

15  Research Foundation, and Robert McGill submitted comments to the FWS on the issue of

16  whether the Desert bald eagle should be designated as a DPS and not be delisted under

17  the FWS's proposed delisting rule.  (Defendants' Statement of Facts ("DSOF") ¶A(9)).

18  Ultimately, the FWS issued a final delisting rule on July 9, 2007, effective August

19  8, 2007, that removed all bald eagles throughout the contiguous 48 states from the

20  threatened species list under the ESA.  72 Fed. Reg. 37,346, 37355 (July 9, 2007).  As

21  such, Desert bald eagles and their habitat currently lack protections under the ESA.

22  Plaintiffs' Statement of Facts ("PSOF") ¶43).  The FWS noted that "the limited habitat

23  available in Arizona makes the bald eagles there particularly vulnerable to habitat

24  threats," and the likelihood of significant emigration into the Sonoran area from eagles

25  elsewhere in the United States was "minimal in the foreseeable future."  72 Fed. Reg. at

26  37,355.  Nonetheless, the FWS stated that "although the Sonoran Desert bald eagle is

27  discrete, it is not significant in relation to the remainder of the taxon.  Sonoran Desert

28  bald eagles lack any biologically or ecologically distinguishing factors.  Although they do

persist in an arid region, Sonoran Desert bald eagles do not have any adaptations that are not found in bald eagles elsewhere.  The adaptability of the species allows its distribution to be widespread throughout the North American continent.  Therefore, we conclude that the Sonoran Desert population of the bald eagle in the lower 48 states is not a listable entity under section 3(16) of the [EPA]."  72 Fed. Reg. at 37,558.  In addition, the FWS stated that the Desert eagle population does not make significant contributions to the "representation," "resiliency," or "redundancy" of the broader eagle population because the Desert eagle population is too small and the "loss [of the Desert eagle] would not result in a decrease in the ability to conserve the bald eagle [throughout the rest of the contiguous United States]."  72 Fed. Reg. at 37,372.

In addition, the FWS stated the following:

> This final delisting rule supersedes the [FWS's] 90-day petition finding because it constitutes a final decision on whether the Southwestern bald eagles, including those in the Sonoran Desert, qualify for listing as a DPS. This decision was made after notice and comment . . . and was based on all of the relevant information that the Service has obtained.  Even if the court in the 90-day finding suit were to find that the plaintiffs' petition warranted further review, this finding addresses the same issues that the [FWS] would have considered as part of a 12-month finding had the [FWS] made a positive 90-day finding on the petition.  This document constitutes the [FWS's] final determination on these issues, and is judicially reviewable with respect to them; therefore, any controversy regarding the August 30, 2006, 90-day finding is now moot.

72 Fed. Reg. at 37,347.  Accordingly, Defendants' contend that the instant action challenging the FWS's August 30, 2006 negative 90-day finding is moot because the FWS made a "final decision on whether the Southwestern bald eagles, including those in the Sonoran Desert, qualify for listing as a DPS[, and] [t]he decision was made after notice and comment . . . and was based on all of the relevant information that the Service has obtained."  72 Fed. Reg. at 37,347.

A federal court's jurisdiction is limited to "cases or controversies."  U.S. Const. art. III, §2.  Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'") (quoting Preiser v.

1  Newkirk, 422 U.S. 395, 401 (1975)).  A case may become moot if the issues presented are

2  no longer "live" or the parties lack a legally cognizable interest in the outcome.

3  Northwest Environmental Defense Center v. Gordon, 849 F.2d 1241, 1244 (9th Cir.

4  1988) (citing Murphy v. Hunt, 455 U.S. 478, 481 (1982)).  However, "[t]he burden of

5  demonstrating mootness is a heavy one," and "[t]he basic question in determining

6  mootness is whether there is a present controversy as to which effective relief can be

7  granted."  Id.  A case may be mooted only if "events have completely and irrevocably

8  eradicated the effects of the alleged violation."  Lindquist v. Idaho State Board of

9  Corrections, 776 F.2d 851, 854 (9th Cir. 1985); Gordon, 849 F.2d at 1244-45 ("The

10 question is whether there can be *any* effective relief.") (emphasis in original).

11         In order to establish that the instant action is moot, Defendants must show that the

12 FWS's July 9, 2007 final delisting rule "completely and irrevocably" rendered

13 inconsequential the declaratory and injunctive relief that Plaintiffs' request in this case.

14 In other words, Defendants must establish that even if the Court were to find that the

15 FWS's August 30, 2006 negative 90-day finding was arbitrary and capricious and thus

16 remand the matter back to the FWS and order them to conduct either a new 90-day

17 finding or a status review, that ruling would be meaningless because the FWS has already

18 examined all of the relevant information on the DPS issue in its July 9, 2007 final

19 delisting rule.  And thus, under no circumstances, would the FWS come to the opposite

20 conclusion and find that the Desert bald eagle should be listed as a DPS.

21         Defendants contend that the FWS's delisting process for the entire bald eagle

22 population in the contiguous 48 states encompassed a status review of the Desert bald

23 eagle population.  Defendants support this contention by referencing the comments that

24 the FWS received from a handful of organizations and individuals regarding whether the

25 Desert bald eagle should be considered a DPS.  (DSOF ¶A(9)).  Based on those

26 comments, Defendants contend that the FWS reexamined its August 30, 2006 negative

27 90-day finding and reaffirmed its conclusion that listing the Desert bald eagle as a DPS

28 was not warranted.  (DSOF ¶A(11)).  Defendants argue that the FWS's subsequent

1    reexamination and conclusion regarding the DPS status of the Desert bald eagle was the

2    equivalent of a status review and thus supercedes and moots the FWS's August 30, 2006

3    negative 90-day finding; therefore, any order by the Court on the instant action would

4    merely require the FWS "to do what it already did in conducting a status review for the

5    delisting determination." (Dkt. #36, p.11). As such, Defendants contend that if Plaintiffs

6    want to challenge the legality of the FWS's findings regarding the DPS status of the

7    Desert bald eagle, then they must challenge the FWS's July 9, 2007 final delisting rule

8    instead of the FWS's August 30, 2006 negative 90-day finding.

9        Defendants cite the Court to American Rivers v. National Marine Fisheries Service

10   to support their mootness argument. 109 F.3d 1484 (9th Cir. 1997) (amended on other

11   grounds). In American Rivers, the Ninth Circuit held that a subsequent biological

12   opinion published by the National Marine Fisheries Service ("NMFS") regarding the

13   operation of the Federal Columbia River Power System and its effects on Snake River

14   salmon superceded the NMFS's previous biological opinion on that same matter, and thus

15   mooted the plaintiffs' challenge to the NMFS's previous biological opinion. Id. at 1491.

16   Defendants contend that their reexamination and decision regarding the Desert bald

17   eagle's DPS status in the July 9, 2007 final delisting rule likewise supercedes their

18   August 30, 2006 negative 90-day finding. However, Defendants' analogy between the

19   biological opinions at issue in American Rivers and the DPS findings at issue here is

20   inadequate. Biological opinions, unlike DPS findings, are not subject to notice and

21   comment rulemaking procedures pursuant to the ESA. As such, Defendants must

22   convinced the Court that the FWS's DPS finding in its July 9, 2007 final delisting rule is

23   one and the same with a status review and all that it entails.

24       In order for a subsequent DPS finding to supercede a status review and 12-month

25   finding, it would have to follow the requisite procedural requirements pursuant to the

26   ESA, such as publishing a positive 90-day finding in the Federal Register that listing as a

27   DPS may be warranted and consulting with interested parties in conducting a status

28   review to determine whether listing as a DPS is truly warranted. But at no time prior to

1    its July 9, 2007 final delisting rule did the FWS indicate that it was reexamining its

2    August 30, 2006 negative 90-day finding.  Indeed, the FWS explicitly stated in its

3    February 16, 2006 reopening of the period for public comment on its delisting proposal

4    that the FWS "need not at this time analyze whether any particular geographic area would

5    constitute a DPS pursuant to [the FWS's] DPS policy."  AR 6564.  However, Defendants

6    contend that "[t]his statement is far from an indication that it would not accept comments

7    on the issue" (Dkt. #35, pp.15-16, n.10); and that since the FWS did in fact receive

8    comments on the DPS issue from a handful of interested parties, the FWS in effect

9    received the same comments and conducted the same analysis that it would have

10   conducted had it instead performed a status review of the Desert bald eagle population.

11   This contention is far-fetched at best.

12         This Court cannot accept the proposition that after explicitly stating that it need not

13   re-examine the DPS status of any particular population segment of the bald eagle, the

14   FWS actually "addresse[d] the same issues that the [FWS] would have considered as part

15   of a 12-month finding had the [FWS] made a positive 90-day finding on the petition."  72

16   Fed. Reg. at 37,347.  The mere fact that a handful of interested parties submitted

17   information concerning the Desert bald eagles' DPS status during the comment period for

18   the FWS's delisting proposal is not the equivalent of publishing a positive 90-day finding

19   in the Federal Register on the specific issue of the Desert eagle's DPS status and then

20   soliciting comment from various federal and state agencies, Tribes, and other interested

21   parties on the particular issue of whether listing the Desert bald eagle as a DPS is

22   warranted.  Case in point, the Amici Curiae[2] ardently contend that if the FWS had

23   conducted a status review of the Desert bald eagle population, then they would have

24   provided the FWS with additional information regarding the Desert eagle and its

25   importance to the Arizona Indian community that the FWS did not consider in its July 9,

26

27         [2]The Amici Curiae in this case are the San Carlos Apache Tribe, the Yavapai-Apache
     Nation, the Tonto Apache Tribe, the Fort McDowell Yavapai Nation, and the Salt River
28   Pima-Maricopa Indian Community.

1  2007 final delisting rule.  The amici briefs, as well as a declaration submitted by Richard

2  Glinski, a biologist who served as Team Leader of the Southwest Bald Eagle Recovery

3  Team from 1983 to 1985 (Dkt. #32), supports the notion that additional interested parties

4  with knowledge relating to the Desert bald eagle population would have submitted

5  additional information to the FWS if the FWS had conducted a status review of the Desert

6  eagle population, instead of just slipping a statement into its July 9, 2007 delisting rule

7  that it considered the DPS issue and reaffirmed its previous conclusion that the Desert

8  bald eagle population is not a DPS.

9         In addition, the Court cannot accept the FWS's unsupported assertion that its

10 finding regarding the DPS status of the Desert bald eagle in its July 9, 2007 final delisting

11 rule moots any challenge to the FWS's August 30, 2006 negative 90-day finding.

12 Defendants have not carried their heavy burden of establishing mootness; they have not

13 convinced the Court that the FWS would not have received or considered additional

14 information on the alleged DPS status of the Desert bald eagle population if the FWS had

15 conducted a status review of the Desert eagle population.  The Court cannot find that the

16 FWS's July 9, 2007 delisting rule completely and irrevocably eradicated the effects of the

17 FWS's alleged ESA violations in conducting its August 30, 2006 negative 90-day finding.

18 Thus, Defendants' request to consider Plaintiffs' challenge moot is denied.

19              **D.  The FWS's Negative 90-Day Finding Was Arbitrary and Capricious**

20        An agency's decision is arbitrary and capricious if the agency does not "examine

21 the relevant data and articulate a satisfactory explanation for its action including a rational

22 connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of

23 U.S., 463 U.S. at 43 (quotation omitted).  When the FWS receives a listing petition from

24 the public, it must review the petition within 90 days to determine whether the "petition

25 presents substantial scientific or commercial information indicating that the petitioned

26 action may be warranted."  16 U.S.C. §1533(b)(3)(A); 50 C.F.R. §424.14(b).  ESA

27 regulations define "substantial information" as "the amount of information that would

28 lead a reasonable person to believe that the measure proposed in the petition may be

1   warranted."  50 C.F.R. 424.14(b) (emphasis added).  In other words, the 90-day review of

2   a listing petition is a cursory review to determine whether a petition contains information

3   that warrants a more in-depth review.

4        The only question before the FWS when it conducts a 90-day review is whether

5   the petitioned action may be warranted, not whether it is warranted.  As such, the

6   application of an evidentiary standard requiring conclusive data in the context of a 90-day

7   review is arbitrary and capricious.  Ctr. for Biological Diversity v. Morgenweck, 351

8   F.Supp.2d 1137, 1141 (D. Colo. 2004) ("[I]t is clear that the ESA does not contemplate

9   that a petition contain conclusive evidence of a high probability of species extinction to

10  warrant further consideration of listing that species.  Instead, it sets forth a lesser standard

11  by which a petitioner must simply show that the substantial information in the Petition

12  demonstrates that listing of the species may be warranted.  FWS's failure to apply this

13  appropriate standard renders its findings and ultimate conclusion flawed."); Moden v.

14  United States Fish & Wildlife Serv., 281 F.Supp.2d 1193, 1203 (D. Or. 2003) ("[T]he

15  standard in reviewing a petition . . . does not require conclusive evidence.").

16       To determine whether a population segment qualifies as a DPS, the FWS must

17  consider two key elements, discreteness and significance.  61 Fed. Reg. 4722, 4725 (Feb.

18  7, 1996).  The FWS and Plaintiffs agree that Desert bald eagles constitute a "discrete"

19  population, because there is virtually no eagle emigration out of, or immigration into, the

20  Sonoran population of bald eagles.  (PSOF ¶7); AR 3543.  However, the FWS concluded

21  in its August 30, 2006 negative 90-day finding that Plaintiffs' petition did not present

22  substantial information to indicate that Desert eagles may be "significant," rejecting the

23  information in the petition that supported the conclusions that Desert bald eagles persist

24  in a unique ecological setting, that the loss of Desert eagles would create a gap in the

25  greater species' range, and that the Desert eagle has markedly different genetic

26  characteristics than the greater bald eagle population.  PSOF ¶37; AR 3543-45.  Thus,

27  whether the FWS's 90-day finding was arbitrary and capricious centers on the second

28

criterion, that is, whether a population segment is "significant" to the taxon to which it belongs, i.e. the greater population of bald eagles.

In examining whether a population may be significant, the FWS considers, among others, the following factors:

> (1) Persistence of the population segment in an ecological setting unusual or unique for its taxon, (2) evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon, (3) evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside of its historic range, [and] (4) evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

61 Fed. Reg. at 4725.  If the FWS concludes that a population segment may be both discrete and significant, then it must consider whether the petition presents substantial information that the alleged DPS should be listed as threatened or endangered pursuant to the ESA.  61 Fed. Reg. 4725; 50 C.F.R. §424.14(b).

The FWS published a negative 90-day finding on August 30, 2006, and stated that the FWS would "not initiate a further status review" of the Desert bald eagle.  AR 3538, 3543-45, 3554.  Despite the various information in Plaintiffs' petition regarding the "significance" of the Desert eagles to the greater bald eagle population, the petition's "detailed information on numerous threats affecting the Sonoran Desert population of bald eagles," and the fact that the FWS was "[l]argely . . . in agreement that these threats are present, and in some cases are having some level of effect on Sonoran Desert bald eagles," the FWS concluded that Plaintiffs' petition failed to present "substantial information indicating that the petitioned action may be warranted."  AR 3538, 3543-45, 3554.  Specifically, the FWS's negative 90-day finding found that Plaintiffs' petition did not present substantial information that Desert bald eagles satisfy the first criterion for significance – persistence in an ecological setting "unique or unusual" for the species – because Desert eagles, like all other eagles, favor riparian zones, i.e. the interface between land and a flowing surface water body.  AR 3543.  Also, the FWS found that Desert eagles merely occupy "the edge of [the Bald Eagle's] range of suitable habitats" rather

1    than a unique or unusual setting for the species, and that the genetic data is "inconclusive

2    with regard to significance."  AR 3543-45, 3554.  Moreover, the FWS's August 30, 2006

3    negative 90-day finding stated that the FWS "[does not] have data to tell [it] conclusively

4    that [the Desert bald eagle] population will tank."  AR 678.  Thus, "[b]ecause of . . . the

5    failure of the petition to conclusively demonstrate increasing threats . . . the Service has

6    determined the population is not in danger of extinction."  AR 977.

7         The question here is whether the FWS examined the relevant data and articulated a

8    satisfactory explanation for its 90-day finding; the issue is whether there is a rational

9    connection between the facts found and the choice made at the 90-day stage.  The

10   Arizona Ecological Services' Phoenix Field Office, Region 2 ("FWS Arizona Field

11   Office"), analyzed Plaintiffs' petition to evaluate its reliability and to determine whether

12   the FWS had data in its files to refute the information in the petition.  (DSOF ¶C(2)); AR

13   308-316.  The administrative record demonstrates that FWS scientists found on multiple

14   occasions that "the [Desert eagle] persists in ecological setting unusual/unique for the

15   taxon," and the "loss [of Desert eagles] would . . . result in a significant gap in the range

16   of the species."  PSOF ¶¶ 26, 27; AR 311-13, 1976-78.  Indeed, the record indicates that

17   each time FWS biologists from the FWS's Arizona Field Office assessed whether listing

18   the Desert bald eagle population as a DPS may be warranted, they found that "no

19   information in [the FWS's] files refutes" Plaintiffs' petition and that the information in

20   the petition "appears to be substantial."  PSOF ¶28; AR 162-67, 215-22, 271-77, 308-16,

21   1976-79, 1990-91.  In addition, the FWS's May 2006 threats analysis found that the

22   threats information presented by the petition "appears to be reliable," and "the petition

23   presents substantial information to indicate that the southwestern population is small;

24   productivity is lower than other bald eagle populations; and adult and nestling mortality

25   [is] high."  AR 488, 692.

26        The record also indicates that FWS Regional Director Benjamin Tugel and Steve

27   Chambers, Senior Scientist, FWS-Region 2, did not believe that the Desert bald eagle

28   population should ultimately be listed as a DPS.  AR 348.  But even if there was

1   disagreement between FWS officials regarding whether listing the Desert bald eagle as a

2   DPS is warranted, the record clearly indicates that a number of FWS scientists believed

3   that there was substantial information that listing the Desert bald eagle as a DPS may be

4   warranted.  The ultimate conclusion regarding whether to list the Desert bald eagle as a

5   DPS is of little consequence when the FWS undertakes a 90-day finding, because at the

6   90-day stage the FWS may only evaluate whether there is sufficient information in a

7   listing petition to indicate that the petitioned action may be warranted, such that the FWS

8   should proceed with a status review of the alleged DPS.

9        On July 18, 2006, FWS scientists and officials from the FWS Arizona Field

10  Office, the Southwest Regional Office in New Mexico, and the Listing Branch Office of

11  the Division of Conservation & Classification in Washington, D.C., participated in a

12  telephone conference call.  AR 1980-1988.  During that call, although Sarah Quamme, of

13  the FWS's Regional Office, stated that there was "no info[rmation] to refute [Plaintiffs'

14  petition] at [the] 90 day stage," FWS biologist Chris Nolan asserted that whether or not a

15  population qualifies as a DPS is "largely a policy call."  AR 1983, 1985.  He informed the

16  participants that "Ben [Tuggle, FWS Southwest Regional Director] and Ren [Loenhoffer,

17  FWS Associate Director in the Washington, D.C. Office] have reached [a] policy call &

18  we need to support [it]."  AR 1985.  Sarah Quamme then stated that the "[a]nswer has to

19  be that its [sic] not a DPS . . . [w]e have marching orders."  AR 1985, 1987.  Doug Krofta,

20  of the Washington, D.C. Office, also stated that "[w]e've been given an answer now we

21  need to find an analysis that works. . . . Need to fit argument in as defensible a fashion as

22  we can."  AR 1986-87.  These statements suggest that the FWS drew an irrational

23  connection between the facts found and the choice made in the 90-day finding; they

24  appear to exemplify an arbitrary and capricious agency action.

25       However, Defendants contend that Plaintiffs "fail to present the back and forth of

26  the discussion and the differing points of view" at the conference call.  (Dkt. #43, p.9)

27  ("In short, even at the conference call, there was not unanimity among the scientists

28  regarding the 'significance' criteria at issue here.").  Defendants agree that there was a

1   disagreement among reasonable FWS scientists as to whether the Desert bald eagle

2   population should be listed as a DPS pursuant to the ESA.  However, Defendants state

3   that the conference call was appropriate because DPS findings involve "policy calls" and

4   depend on whether "the Director of FWS 'considered the relevant factors and articulated

5   a rational connection between the facts found and the choices made,' not whether there

6   may have been dissenting views with respect to that decision."  (Dkt. #37, p.17; Dkt. #43

7   , p.7) (citing Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service, 475 F.3d

8   1136, 1145 (9th Cir. 2007)).  To support this line of reasoning, Defendants rely on

9   Northwest Ecosystem Alliance, in which the Ninth Circuit stated that the FWS has the

10  right to change its mind after internal deliberation and found that a final determination by

11  the FWS was not arbitrary and capricious even though it reached the opposite result from

12  its preliminary determination and provided no new information to support its conclusion.

13  475 F.3d at 1145.  However, Northwest Ecosystem Alliance is inapposite here because it

14  involved a 12-month finding, which employs the more stringent "is warranted"

15  evidentiary burden as opposed to the 90-day finding's "may be warranted" standard.

16       The 90-day finding's "may be warranted" standard merely requires the

17  consideration of whether a "reasonable person" could conclude that the petitioned action

18  may be warranted.  16 U.S.C. §1533(b)(3)(A); 50 C.F.R. §424.14(b).  Thus, it appears

19  that where there is reasonable disagreement among FWS scientists, the "may be

20  warranted" standard is satisfied, and the FWS should publish a positive 90-day finding

21  and proceed with a status review, at which time the FWS may employ the more-searching

22  "is warranted" standard.  The specific question at the 90-day stage is not whether there is

23  conclusive evidence to establish that the petitioned action is warranted, but merely

24  whether there is enough information to lead a reasonable scientist to believe that the

25  petitioned action may be warranted.  In this case, that question is answered affirmatively

26  by the information contained in the administrative record; the fact that the FWS's

27  scientists found that no information in the FWS's files refuted the evidence in Plaintiffs'

28  petition, as well as the fact that FWS scientists disagreed as to whether the petitioned

1  action was ultimately warranted, clearly supports a 90-day finding that the petitioned

2  action may be warranted.

3       In Ctr. for Biological Diversity v. Kempthorne, the district court noted that "drafts

4  [by FWS officials finding the petitioned action may be warranted] serve as evidence that

5  reasonable people could find that the petitioned action was warranted, not that the [FWS]

6  should never change its mind."  2007 WL 163244 at *7, n.1 (N.D.Cal. 2007).  The district

7  court stated that "the [reasonable person] standard . . . contemplates that where there is

8  disagreement among reasonable scientists, then the FWS should make the 'may be

9  warranted' finding and then proceed to the more-searching next step in the ESA process."

10  Id. at *7.  This Court agrees; such disagreement among reasonable FWS scientists

11  satisfies the reasonable person standard and necessitates a positive 90-day finding that the

12  petitioned action may be warranted, requiring the FWS to proceed with a status review to

13  determine whether the petitioned action is ultimately warranted.

14       "If courts are to defer to agency expertise . . . then they must have confidence in

15  the objectivity of the agency's decision making process."  Native Ecosystems Council v.

16  United States Forest Serv., 1999 U.S. Dist. LEXIS 22243 at *9-10 (D. Mont. 1999).  In

17  this case, not only does the administrative reflect that Plaintiffs' petition appears to

18  present substantial information that the petitioned action may be warranted, FWS

19  scientists found that there was no information in the FWS's files to refute the information

20  in the petition, and the FWS published a negative 90-day finding after the July 18, 2006

21  conference call established that there was disagreement among FWS scientists as to

22  whether listing the Desert bald eagle as a DPS was ultimately warranted.  Moreover, it

23  appears that FWS participants in the July 18, 2006 conference call received "marching

24  orders" and were directed to find an analysis that fit with a negative 90-day finding on the

25  DPS status of the Desert bald eagle.  These facts cause the Court to have no confidence in

26  the objectivity of the agency's decision making process in its August 30, 2006 90-day

27  finding.  Accordingly, the Court finds that the FWS's decision to ignore the reasonable

28  disagreements among its scientists at the initial 90-day stage and not issue a positive 90-

1   day finding and proceed with a status review to determine whether the petitioned action

2   was in fact warranted, violates the ESA and is arbitrary and capricious under the APA.

3       **E.  Remedy**

4       The APA provides that a court shall hold unlawful and set aside agency action,

5   findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

6   otherwise not in accordance with law.  5 U.S.C. §706.  Upon finding a violation of the

7   ESA, courts have broad discretion to fashion injunctive relief.  National Wildlife

8   Federation v. National Marine Fisheries Service, 481 F.3d 1224, 1242 (9th Cir. 2007).

9   The "traditional bases for injunctive relief are irreparable injury and inadequacy of legal

10  remedies."  Idaho Watersheds Project v. Hahn, 307 F.3d 815, 832-33 (9th Cir. 2002).

11  The Court must balance the equities between the parties and give due regard to the public

12  interest.  Id.  And if environmental injury is sufficiently likely, then "the balance of harms

13  will usually favor the issuance of an injunction to protect the environment."  Id.

14  "Although the ordinary remedy when a court finds an agency's action to be arbitrary and

15  capricious is to remand for further administrative proceedings, a court can order equitable

16  relief or remand with specific instructions in rare circumstances."  Earth Island Inst. v.

17  Hogarth, 494 F.3d 757, 770 (9th Cir. 2007) (quotation omitted).

18      First, declaratory relief is appropriate in this case to the extent, as previously

19  discussed in this order (Section III(D)), that the Court found the FWS's negative 90-day

20  finding to be arbitrary and capricious.  Second, due to the FWS's arbitrary and capricious

21  action, injunctive relief is also appropriate.  Plaintiffs seek an injunction ordering the

22  FWS "to immediately commence a status review of Desert eagles rather than merely

23  remand to the agency for a new 90 day finding."  (Dkt. #39, p.12).  In addition, Plaintiffs

24  request that the Court "enjoin FWS from removing ESA protections from Desert eagles

25  prior to conducting a status review of [the Desert eagle] population."  (Dkt. #28, p.13).

26      Plaintiffs cite the Court to Colo. River Cutthroat Trout v. Kempthorne, 448

27  F.Supp.2d 170, 176 (D.DC 2006), and Ctr. for Biological Diversity v. Morgenweck, 351

28  F.Supp.2d 1137, 1144 (D.Colo. 2004).  In those cases, rather than remand the matter to

1   the FWS for a new 90-day finding, the district courts ordered the FWS to proceed with a

2   status review because the FWS's 90-day review unlawfully considered information from

3   outside agencies and thus was overinclusive; the courts reasoned that the FWS had in

4   effect already begun a status review.  Likewise, here, the FWS unlawfully considered

5   information from an outside agency, the Arizona Game & Fish Department ("AGFD"), at

6   the 90-day stage.

7        When deciding whether a petitioned listing action may be warranted, the FWS

8   may analyze only the petition itself and information in the agency's files.  Colo. River

9   Cutthroat Trout, 448 F.Supp.2d at 176 ("The FWS has explicitly acknowledged in other

10  findings that the 90-day finding is limited to the petition and information available in the

11  files of the FWS.").  The FWS may not solicit information from outside parties until the

12  FWS makes a positive 90-day finding and initiates a formal status review.  Id. ("Even a

13  cursory reading of [the ESA and its implementing regulations] shows that [the

14  regulations] refer to the FWS's right to consult with affected states in the course of a

15  status review or subsequent listing determinations, not at the 90-day review stage.").

16       Here, the FWS solicited opinions from the AGFD on its proposed 90-day finding

17  and made changes in response to the AGFD's comments.  AR 662, 873.  Defendants

18  contend that the FWS's "limited" communications with the AGFD about Plaintiffs'

19  petition and the subsequent "minor edits" that the FWS made to its 90-day finding were

20  lawfully conducted pursuant to a 2002 Memorandum of Agreement ("MOA") between

21  the FWS and the AGFD to "facilitate joint participation, communication, coordination,

22  and collaboration" in implementing the ESA within the State of Arizona."  (Dkt. #36,

23  p.23).  However, an MOA does not trump the ESA and its implementing regulations'

24  direction that "petitions that are meritorious on their face should not be subject to

25  refutation by information and views provided by selected third-parties solicited by FWS."

26  Morgenweck, 351 F.Supp.2d at 1143.

27       Moreover, the FWS examined the information in Plaintiff's petition regarding the

28  threats to the Desert bald eagle.  (Dkt. #36, p.22).  However, the FWS is not required to

1   consider whether a petition presents substantial information that an alleged DPS should

2   be listed as threatened or endangered pursuant to the ESA unless the FWS makes a

3   positive 90-day finding.  61 Fed. Reg. 4725; 50 C.F.R. §424.14(b).  As such, by both

4   seeking and obtaining comments from an outside agency and conducting a threats

5   analysis with respect to the Desert eagle population, the FWS in effect made an initial

6   positive 90-day finding that listing the Desert eagle as a DPS may be warranted and thus

7   began a status review to determine whether listing the Desert eagle was actually

8   warranted.  Further, in its July 9, 2007 final delisting rule, the FWS purported to have

9   already conducted the equivalent of a status review; but, as discussed above, the Court

10  found such review inadequate under the ESA.  Thus, since the FWS in effect already

11  began a status review, and since, as previously discussed, the reasonable disagreement

12  among the FWS's scientists necessitates a positive 90-day finding, simply remanding this

13  matter back to the FWS for a new 90-day finding would constitute inequitable and

14  vacuous relief.

15       Defendants state that requiring the FWS to proceed with a status review is akin to

16  prejudging the outcome of the FWS's review and thus constitutes an unlawful intrusion

17  into the executive function.  However, by exercising its discretion in fashioning the

18  appropriate relief in this case and requiring the FWS to proceed with a status review, the

19  Court is in no way commenting on or directing any particular outcome of the FWS's

20  decision on whether listing the Desert bald eagle as a DPS is warranted.

21       In light of the many threats facing the Desert bald eagle and the harm that the

22  Desert eagle might suffer in the interim should the FWS find that the Desert eagle is a

23  DPS worthy of continued ESA protection, the Court will also exercise its broad discretion

24  in fashioning injunctive relief to enjoin the application of the FWS's July 9, 2007 final

25  delisting rule to the discrete population of Desert bald eagles pending the outcome of the

26  FWS's status review.  By enjoining the delisting of the discrete population of Desert bald

27  eagles and maintaining the previous ESA protections that the Desert eagles received as a

28  "threatened" species pursuant to the ESA, the Court is not challenging the FWS's July 9,

1   2007 final delisting rule, but merely maintaining the status quo with respect to the Desert

2   bald eagle population as of the time that the FWS made its arbitrary and capricious

3   negative 90-day finding on August 30, 2006.  The FWS's July 7, 2007 final delisting rule,

4   as applied to the discrete population of Desert bald eagles, is inextricably intertwined with

5   the FWS's arbitrary and capricious August 30, 2006 negative 90-day finding.   If the

6   FWS had applied the appropriate evidentiary standard at the 90-day stage and published

7   the requisite positive 90-day finding, and then proceeded with a status review of the

8   Desert bald eagle population, the FWS would have been required to determine whether to

9   list the Desert bald eagle as a DPS.  And if the FWS had concluded that the Desert eagle

10  population was a DPS, then the FWS would have been required to separately assess the

11  status of the Desert bald eagle DPS, as opposed to merely assessing the status of the

12  entire bald eagle population, to determine whether the Desert bald eagle DPS continued to

13  warrant ESA protections.

14          The Court is aware that the ordinary remedy in finding that an agency's action is

15  arbitrary and capricious is to remand for further administrative proceedings, and that it

16  can order equitable relief or remand with specific instructions only in rare circumstances.

17  See Hogarth, 494 F.3d at 770 (quotation omitted).  However, based on the administrative

18  record and the arguments presented to the Court, this is one of those rare circumstances.

19  The discrete population of Desert bald eagles, which the FWS acknowledges can easily

20  be cordoned off and is still particularly vulnerable to habitat threats, should not face

21  increased risks to its existence prior to a lawful decision on Plaintiffs' petition to list the

22  Desert bald eagle as a DPS.  The Court is not willing to risk the continued vitality of the

23  Desert bald eagle pending the FWS's lawful determination of whether listing the Desert

24  eagle as a DPS is warranted, and if so, whether the Desert eagle DPS should continue to

25  receive ESA protections.  Accordingly, the Court enjoins the application of the FWS's

26  July 9, 2007 delisting rule to the discrete population of Desert bald eagles to ensure that

27  Desert eagles continue to receive ESA protections until the FWS makes a lawful

28  determination of their status as a DPS.

## IV.    CONCLUSION

In sum, the FWS's July 9, 2007 final delisting rule does not moot Plaintiffs' challenge to the FWS' August 30, 2006 negative 90-day finding.  In addition, the FWS's August 30, 2006 finding that Plaintiffs' petition did not present substantial information that the petitioned action may be warranted violated the ESA and was arbitrary and capricious under the APA.  The FWS applied an inappropriately strict evidentiary burden on Plaintiffs' petition at the 90-day review stage and thus arbitrarily and capriciously concluded that the petition did not present substantial information that listing the Desert bald eagle may be warranted.  Moreover, the FWS arbitrarily and capriciously conducted the 90-day review of Plaintiffs' petition by soliciting information and opinions from a limited outside source.

**Accordingly,**

**IT IS HEREBY ORDERED** that the San Carlos Apache Tribe, Yavapai-Apache Nation, Tonto Apache Tribe, Fort McDowell Yavapai Nation, and Salt River Pima-Maricopa Indian Community's motions for leave to file amicus curiae briefs (Dkt. #s 47, 49, 51) are GRANTED.

**IT IS FURTHER ORDERED** that Defendants' cross-motion for summary judgment (Dkt. # 36) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment (Dkt. #28) is GRANTED.

**IT IS FURTHER ORDERED** that the Court DECLARES that the United States Fish and Wildlife Service ("FWS") violated the Endangered Species Act ("ESA") by failing to make the requisite positive 90-day finding that Plaintiffs' October 6, 2004 petition to list the bald eagle population of the Sonoran Desert region of the American southwest ("the Desert bald eagle") as a distinct population segment ("DPS") pursuant to the ESA may be warranted;

1    **IT IS FURTHER ORDERED** that the Court DECLARES that the FWS's August

2 30, 2006 negative 90-day finding on Plaintiffs' petition was arbitrary and capricious, and

3 contrary to law, under the Administrative Procedure Act;

4    **IT IS FURTHER ORDERED** that the FWS must conduct a status review of the

5 Desert bald eagle population pursuant to the ESA to determine whether listing the Desert

6 eagle population as a DPS is warranted, and if so, whether listing the Desert bald eagle

7 DPS as threatened or endangered pursuant to the ESA is warranted;

8    **IT IS FURTHER ORDERED** that the FWS must issue a 12-month finding on

9 whether listing the Desert bald eagle population as a DPS is warranted, and if so, whether

10 listing the Desert eagle DPS as threatened or endangered is warranted; the FWS must

11 issue the 12-month finding within nine months pursuant to 16 U.S.C. §1533(b)(3)(B);

12    **IT IS FURTHER ORDERED** that the FWS is ENJOINED from removing the

13 discrete population of Desert bald eagles from the threatened species list under the ESA

14 pursuant to the FWS's July 9, 2007 final delisting rule pending the outcome of the FWS's

15 status review and 12-month finding.

16    **IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter

17 judgment accordingly.

18    DATED this 5th day of March, 2008.

19

20

21    _____

22    Mary H. Murguia
      United States District Judge

23

24

25

26

27

28