**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and MARICOPA AUDUBON SOCIETY,<br><br>Plaintiffs,<br><br>vs.<br><br>KENNETH SALAZAR, in his official capacity as Secretary of the United States Department of the Interior, and ROWAN GOULD, in his official capacity as Acting Director of the United States Fish and Wildlife Service,<br><br>Defendants. | No. CV 07-0038-PHX-MHM<br><br>**ORDER** |

Currently before the Court are Defendants Kenneth Salazar and Rowan Gould's ("Defendants") Motion for Dissolution of Injunction, (Doc 82); and Plaintiffs Center for Biological Diversity and Maricopa Audubon Society's ("Plaintiffs") Motion for Leave to File Supplemental Complaint. (Doc. 88). After careful consideration of the pleadings, and after holding oral argument on September 14, 2010, the Court issues the following Order.

**II.   REGULATORY & PROCEDURAL HISTORY**

The bald eagle was first listed as an endangered species pursuant to the Endangered

Species Act ("ESA") on February 14, 1978[1]. AR 6560; 72 Fed. Reg. 6230 (Feb. 14, 1978). The primary goal of the ESA is to restore endangered and threatened animals and plants to the point where they are again viable, self-sustaining members of their ecosystems. AR 5992. The U.S. Fish and Wildlife Service ("FWS") administers the ESA with respect to freshwater fish and all other species, including the bald eagle.

Section 4(f) of the ESA provides for the development and implementation of recovery plans for listed species to identify, describe, and schedule the actions necessary to restore endangered and threatened species to a more secure condition. AR 5992. The FWS established five recovery regions for the bald eagle, including one for the southwestern corner of the United States (consisting of Arizona, the area of California bordering the Lower Colorado River, New Mexico, Oklahoma, and Texas west of the 100th Meridian). AR 5992, 5813.

On July 12, 1995, the FWS reclassified the bald eagle from "endangered" to "threatened." 60 Fed. Reg. 36,000 (July 12, 1995); AR 5990-91. At that time, the FWS declared that it recognized "only one population of bald eagles in the lower 48 States," because Sonoran Desert bald eagles ("Desert bald eagle") "are not reproductively isolated." AR 5994, 5995. However, the FWS has since changed its mind, stating that data indicating that no bald eagles have immigrated to, and only one eagle has emigrated from, the Desert bald eagle population establishes that "the Sonoran Desert bald eagle population [is] discrete from other bald eagle populations." AR 3543; 72 Fed. Reg. 37346, 37355 (July 9, 2007).

On October 6, 2004, Plaintiffs petitioned the FWS to define the Desert bald eagle as a distinct population segment ("DPS") and to then list that DPS as "endangered" pursuant to the ESA. AR 3578-93. Subsequently, on March 27, 2006, Plaintiffs filed a lawsuit against the U.S. Department of the Interior and the FWS for failing to make a timely finding on Plaintiffs' petition. AR 3538. The parties reached a settlement and the FWS agreed to

---

[1] The bald eagle was listed as endangered in 43 states, and as threatened in the States of Michigan, Minnesota, Wisconsin, Oregon, and Washington.

1 complete its finding by August 2006. AR 3200, 3268, 3751-56.

2 On August 30, 2006, the FWS issued a negative 90-day finding, which concluded that
3 Plaintiffs' petition "[did] not present substantial scientific or commercial information
4 indicating that the petitioned action may be warranted." 71 Fed. Reg. 51,549; 51,551 (Aug.
5 30, 2006); AR 3538. As such, the FWS did not initiate a status review of the Desert bald
6 eagle to determine whether listing the Desert eagle population as a DPS is in fact warranted.
7 AR 3554. In response, on January 5, 2007, Plaintiffs brought suit challenging the FWS's
8 August 30, 2006 negative 90-day finding. (Complaint, Doc. 1).

9 Eventually, Plaintiffs moved for summary judgment, arguing that the FWS's August
10 30, 2006 90-day finding violated the Endangered Species Act ("ESA") and was arbitrary and
11 capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §706. (Doc. 27).
12 Defendants countered by filing a cross-motion for summary judgment, arguing that Plaintiffs'
13 challenge to the FWS's August 30, 2006 finding was moot due to the FWS's July 9, 2007
14 final delisting rule, and in the alternative, the FWS's 90-day finding did not violate the ESA
15 and was reasonable under the APA. (Doc. 36). On March 6, 2008, this Court issued an
16 Order adjudicating these motions, granting Plaintiffs' motion, but denying Defendants'.
17 (Doc. 53). Specifically, the Court declared: (1) "that the United States Fish and Wildlife
18 Service ("FWS") violated the Endangered Species Act ("ESA") by failing to make the
19 requisite positive 90-day finding that Plaintiffs' October 6, 2004 petition to list the bald eagle
20 population of the Sonoran Desert region of the American southwest ("the Desert bald eagle")
21 as a distinct population segment ("DPS") pursuant to the ESA may be warranted," (Id. at
22 25); and (2) "that the FWS's August 30, 2006 negative 90-day finding on Plaintiffs' petition
23 was arbitrary and capricious, and contrary to law, under the Administrative Procedure Act."
24 (Id. at 26). Accordingly, the Court ordered "that the FWS must issue a 12-month finding on
25 whether listing the Desert bald eagle population as a DPS is warranted, and if so, whether
26 listing the Desert eagle DPS as threatened or endangered is warranted; the FWS must issue
27 the 12-month finding within nine months pursuant to 16 U.S.C. §1533(b)(3)(B)." (Id. at 26).
28 Finally, the Court enjoined the FWS "from removing the discrete population of Desert bald

1  eagles from the threatened species list under the ESA pursuant to the FWS's July 9, 2007
2  final delisting rule pending the outcome of the FWS's status review and 12-month finding."
3  (Id.).

4  On February 24, 2010, Defendants filed Notice of Issuance of 12-Month Finding,
5  alerting the Court that the FWS had completed its status review regarding the Sonoran Desert
6  bald eagle population and submitted its 12-month finding to the Federal Register on February
7  19, 2010. (Doc. 81). That same day, Defendants filed their instant Motion for Dissolution
8  of Injunction. (Doc 82). On March 22, 2010, Plaintiffs filed their instant Motion for Leave
9  to File Supplemental Complaint. (Doc. 88). These motions became fully briefed on April
10  12, 2010, (Doc. 121), and April 22, 2010, respectively. (Doc. 124). Additionally, three
11  Amicus Curiae briefs opposing Defendants' Motion have been filed by the Tonto Apache
12  Tribe, (Doc 112), the Hualapai Tribe, (Doc. 118), and the Salt River Pima-Maricopa Indian
13  Community. (Doc. 120).

14  **III.    DEFENDANTS' MOTION FOR DISSOLUTION OF INJUNCTION**

15  **A.    Legal Standard**

16  "A court which issues an injunction retains jurisdiction to modify the terms of the
17  injunction if a change in circumstances so requires." Nicacio v. United States Immigration
18  & Naturalization Serv., 797 F.2d 700, 706 (9th Cir. 1985); see also Clark v. Coye, 60 F.3d
19  600, 606 (9th Cir. 1995) ("a federal court which has imposed an injunction
20  also retains the power to suspend or modify it"). A party seeking dissolution of an injunction
21  may meet its initial burden by demonstrating "a significant change either in factual
22  conditions or in law." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992); see
23  Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000) ("A party seeking modification or
24  dissolution of an injunction bears the burden of establishing that a significant change in facts
25  or law warrants revision or dissolution of the injunction"); Univ. of Haw. Prof'l Assembly
26  v. Cayetano, 125 F. Supp. 2d 1237, 1240 (D. Haw. 2000) ("[C]ourts have continuing
27  jurisdiction to terminate, dissolve, vacate, or modify an injunction or an interlocutory order
28  in the event that changed circumstances require it." (citing United States v. Oregon, 769 F.2d

1 1410, 1416 (9th Cir. 1985) and In re Detroit Auto Dealers Ass'n, Inc., 84 F.3d 787, 789 (6th Cir. 1996)). "A significant change is one that pertains to the underlying reasons for the injunction." Moon v. GMAC Mortgage Corp., 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24, 2008) (citing United States v. Swift & Co., 189 F. Supp. 885, 905 (D. Ill. 1960), aff'd per curium, 367 U.S. 909 (1961)). Under a flexible standard based on Federal Rule of Civil Procedure 60(b)(5), "the Ninth Circuit has directed courts to 'take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree.'" Orantes-Hernandez v. Gonzales, 504 F. Supp. 2d 825, 830 (C.D. Cal. 2007) (quoting Bellevue Manor Assocs. v. United States, 165 F.3d 1249, 1256 (9th Cir. 1999)); see also System Fed'n No. 91 Ry. Employees' Dep't v. Wright, 364 U.S. 642, 648 (1961) (holding district court has "wide discretion" to modify injunctive relief upon changed circumstances or new facts).

### B. Discussion

The Parties' disagreement concerning the propriety of dissolving the injunction is predicated on two drastically different understandings of the basis for the injunction. Defendants believe that the purpose of the Court's injunction was merely to preserve the status quo until the FWS conducted a status review and issued a 12-month finding on the Desert bald eagle population. Having completed those tasks, FWS argues that there has been a significant change in the factual conditions underlying the injunction and, as a result, dissolution is warranted. Plaintiffs, on the other hand, advance a broader view of the basis for the injunction, arguing that the Court's March 6 2009 Order expressed substantive as well as procedural concerns about the FWS' conduct with respect to the Desert bald eagle. In other words, Plaintiffs believe that this Court meant to preserve the status quo not only until such time as the FWS completed the status review and issued a 12-month finding (procedural), but also until the lawfulness of the 12-month finding could be subjected to judicial scrutiny (substantive). Accordingly, in opposing Defendants' motion, Plaintiffs point to evidence that they believe strongly suggests that the FWS has repeated the arbitrary

1   and capricious decision making it engaged in with respect to the 90-day finding.[2] Based on
2   this evidence they argue that the substantive facts underlying the injunction—the
3   vulnerability of the Desert bald eagle and the FWS's lack of objectivity—have not changed
4   significantly and, therefore, the injunction should remain in place pending judicial review of
5   the 12-month finding.

6   Plaintiffs' belief with respect to the existence of a substantive component to the
7   injunction is based primarily on the March 6, 2008 Order's reference to the need for a
8   "lawful decision" or "lawful determination" on Plaintiffs' petition to list the Desert bald
9   eagle as a DPS. Plaintiffs place a great deal of emphasis on the Court's use of the word
10  "lawful." In ordering injunctive relief, the Court's primary concern was maintaining the
11  status quo. Had the FWS properly issued a positive 90-day finding, it would not have been
12  able to de-list the Desert bald eagle until it had conducted a status review and issued a 12-
13  month finding. The FWS ability to de-list the eagle at that time, however, would not have
14  been conditioned on judicial review of the 12-month finding. Thus, the Court made the
15  statement that it was "not willing to risk the continued vitality of the Desert bald eagle
16  pending the FWS's lawful determination of whether listing the Desert eagle as a DPS is
17  warranted," (Doc. 53, p. 24), only to convey the importance of maintaining the status quo
18  until such time as the status review and 12-month finding had been completed. In other
19  words, the Court did not find it equitable that the Desert bald eagle should be subjected to
20  possible harm pending the FWS completion of steps it should lawfully have taken before
21  attempting to de-list the Desert bald eagle.

22  Additionally, had the Court intended to condition the lifting of the injunction upon

---

[2] In support of their position Plaintiffs rely on two memoranda. The first memo, dated August 24, 2009, was sent by the Regional Director of FWS Region 2 to the Assistant Director of FWS in Washington D.C.. It conveys the Region 2 office's recommendation that the Desert bald eagle be listed as a DPA and expresses its concern that Washington Office had added unwarranted elements to the DPS policy (Doc. 89, Exh. A). The second is from the Assistant Director to Regional Director. In it, the Assistant Director rejects Region 2's proposed 12-month finding and directs the Regional Director to revise the findings so as not list the Desert bald eagle as a DPS. (Id., Exh. B).

- 6 -

judicial review of the FWS's 12-month finding, it would have made that explicitly clear in its Order. Instead, the Court stated that its decision to enter an injunction was in "no way commenting on or directing any particular outcome of the FWS's decision on whether listing the Desert bald eagle as a DPS is warranted." (Id. at 23). The Court's intent to preserve the status quo is also captured by the language of the injunction itself which only enjoined the FWS "from removing the discrete population of Desert bald eagles from the threatened species list under the ESA pursuant to the FWS's July 9, 2007 final delisting rule *pending the outcome* of the FWS's status review and12-month finding." (Id. at 26). (emphasis added). The FWS has reached an outcome, it is just not the one for which Plaintiffs had hoped.

Because the FWS has completed a status review and issued a 12-month finding, Plaintiffs are now in the procedural posture they would have been in had the FWS issued a positive 90-day finding in the first place. Consequently, the underlying reason for the injunction has disappeared; the status quo has been maintained. The injunction, therefore, must be dissolved.

**IV. PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT**

The Court turns next to Plaintiffs' Motion for Leave to File Supplemental Complaint. As the caption of their motion suggests, Plaintiffs request leave from this Court to file a supplemental complaint challenging the FWS's 12-month finding. Supplemental pleadings are governed by Fed. R. Civ. Pro. 15(d), which states that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Rule 15(d)'s purpose is to provide a mechanism for parties to file additional causes of action based on facts not in existence when the plaintiff filed the original complaint. See, e.g., Cabrera v. City of Huntington Park, 159 F.3d 374, 382 (9th Cir. 1998) (per curiam). It is "a tool of judicial economy and convenience," and its "use is therefore favored." Keith v. Volpe, 858 F.2d 467, 473 (9th Cir. 1988). "While leave to permit

1 supplemental pleading is favored, it cannot be used to introduce a separate, distinct and new
2 cause of action." Planned Parenthood v. Neely, 130 F.3d 400, 402 (9th Cir. 1997) (internal
3 citation and quotation omitted).

4 The Court begins by noting that "[c]ourts have generally granted motions to
5 supplement under FRCP 15(d) where a matter is still pending, and final judgment has not yet
6 been entered." Western Watersheds Project v. U.S. Forest Service, 2009 WL 3151121, *3
7 (D. Idaho Sept. 26, 2009) (citing LaSalvia v. United Dairymen of Ariz., 804 F.2d 1113 (9th
8 Cir.1986) and San-Luis and Delta-Mendota Water Authority v. U.S. Dept. Of Interior, 236
9 F.R.D. 491 (E.D. Cal. 2006)). This is not such a matter, as judgment has been entered, and
10 the Plaintiffs' Complaint and this action have been dismissed. (Doc. 57, p.2). Still, Plaintiffs
11 have correctly pointed out that entry of judgment does not preclude the use of Rule 15(d).
12 See Griffin v. County Sch. Bd., 377 U.S. 218 (1964) Volpe, 858 F.2d at 467. Post-judgment
13 application of the rule, however, is generally limited to situations in which a court
14 specifically retained jurisdiction over the matter and where the conduct "plaintiffs sought to
15 challenge through supplemental pleading were alleged to be specific attempts by the
16 defendants to contravene the courts' earlier rulings." Planned Parenthood, 130 F.3d at 403.
17 Neither factor is present in this case. Defendants complied with this Court's March 6, 2008
18 Order in full. They have not therefore attempted to circumvent, contravene, or otherwise
19 thwart the relief ordered by the Court. Additionally, this Court did not specifically retain
20 jurisdiction over all future proceedings between these Parties. To the extent, however,
21 Plaintiffs argue that the Court's injunction was an implicit retention of jurisdiction, such an
22 argument is now moot due to the dissolution of the injunction.

23 In support of their motion, Plaintiffs also point to the direct relationship between the
24 90-day and the 12-month findings. There is obviously some relationship between these two
25 findings. A positive 90-day finding triggers a status review, which in turn leads to a 12-
26 month finding, and the legal and factual subject matter of both findings will of course be
27 similar. There is, however, no legal relationship between the two findings. A positive 90-
28 day finding does not compel any particular result with respect to the 12-month finding, and

each finding has its own administrative record.  Presumably then, the direct relationship to which Plaintiffs refer is based on their allegation that the 12-month finding appears to be based on the same type of arbitrary and capricious decision-making the FWS exhibited in issuing the 90-day finding.  Even if such a relationship exists, it does not change the fact that Plaintiffs' proposed supplemental complaint would not affect in any manner whatsoever this Court's findings with respect to the 90-day finding; that matter is now completely resolved. Instead, they are challenging a new and separate final agency action, and admit that their challenge will be based primarily on a new administrative record.  (Doc.  89 at 13 n.8). Accordingly, the situation at hand appears to resemble the one confronted by the Ninth Circuit in Planned Parenthood.  In Planned Parenthood, the Ninth Circuit found that a district judge abused his discretion by allowing plaintiffs to file a supplemental complaint where "the supplemental complaint challenged a different statute than the one that had been successfully challenged in the original suit," even though "both the original suit and the supplemental complaint sought to challenge Arizona's parental consent law." 130 F.3d at 402.  Although statutes are not at issue here, the situation is similar, as Plaintiffs intend to challenge a different final agency action—the 12-month finding—than the one they challenged in their original suit—the 90-day finding.  Plaintiffs' new challenge, therefore, appears to be a "separate, distinct and new cause of action," which is not properly allowed under Rule 15(d). Id. at  402; see Western Watersheds Project, 2009 WL 3151121 at *2 ("It is clear that WWP takes issue with the supplemental analyses [the court ordered the Forest Service to preform]. But WWP's claims of statutory violations arising from the Forest Service's supplemental analyses are new claims appropriately raised in a new cause of action.").

     Plaintiffs also argue that allowing them to file a supplemental complaint will promote Rule 15(d)'s goal of judicial economy.  To determine if efficiency might be achieved, courts assess "whether the entire controversy between the parties could be settled in one action . . . ." Id. at  402 (quoting 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2D § 1506 (1990)).  This suit would necessarily involve two separate actions, as the original action is completely resolved and the injunction has been dissolved.  See id. (finding judicial

1 economy did not support allowing a supplemental complaint because "in the case at hand 2 there would necessarily be two actions since the original suit had been settled for some 3 time."). There also do not appear to be any technical obstacles to Plaintiffs bringing a new 4 and separate lawsuit. Id. (citing United States v. Reiten, 313 F.2d 673, 675 (9th Cir. 1963) 5 ( "[T]he general purpose of the Rules [regarding amended and supplemental complaints is] 6 to minimize technical obstacles to a determination of the controversy on its merits.")). The 7 goal of judicial economy, therefore, does not appear to be served by allowing the filing of 8 a supplemental complaint.

9 The same cannot be said, however, with respect to allowing this case to be assigned 10 to a new Judge. Any new case filed by Plaintiffs will be substantively similar to its challenge 11 of the 90-day finding, involving similar parties, facts, science, law, and argument. Because 12 of the Courts familiarity with the parties, facts, science, law, and argument, the goal of 13 judicial economy would be served by ensuring that the undersigned presides over any future 14 action brought by Plaintiffs concerning the 12-month finding. Accordingly, the Court will 15 borrow a page from the play book of its sister court in the District of Idaho, which, when 16 faced with a similar procedural circumstance, ordered that any new case filed be "assigned 17 to the undersigned judge for purposes of judicial economy." Western Watersheds Project, 18 2009 WL 3151121 at *4. The Western Watersheds Project court reasoned that requiring the 19 plaintiff to file a new lawsuit, but keeping the case in front of the same judge, "would allow 20 for judicial efficiency with respect to the factual and legal background of the case, without 21 disturbing the finality of the [] dismissal [in the original suit]." Id. The Court agrees with 22 that logic and finds it applies equally to this matter.

23 Additionally, L.R.Civ. 42.1.(a) allows for related cases to be transferred to a single 24 Judge when those cases:

25 (1) arise from substantially the same transaction or event; (2) involve substantially the same parties or property; (3) involve the same patent, 26 trademark, or copyright; (4) calls for determination of substantially the same questions of law; or (5) for any other reason would entail substantial 27 duplication of labor if heard by different Judges.

28 Two factors that must be considered when determining to which judge a case should be

- 10 -

1  assigned are "which Judge has the most familiarity with the issues involved in the cases," and
2  "any other factor serving the interest of judicial economy." L.R.Civ. 42.1(d). The purpose
3  of Rule 42.1 is to eliminate substantial duplication of labor. See L.R.Civ. 42.1(a). As the
4  Court has already explained, it is familiar with many of the issues that will likely arise in
5  Plaintiffs' challenge to the FWS' 12-month finding, the substantive areas of the law that will
6  need to be applied, and the procedural and factual history of the dispute between these
7  Parties. Allowing this case to be assigned to a new Judge would force that Judge to
8  undertake and duplicate labor already undertaken during the pendency of this case. Thus,
9  although not directly applicable to the instant situation, mandating that Plaintiffs' challenge
10 to the FWS' 12-month finding be assigned to the undersigned comports with Rule 42.1's
11 overarching goal of judicial economy.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendants Kenneth Salazar and Rowan Gould's Motion for Dissolution of Injunction. (Doc 82).

**IT IS FURTHER ORDERED** denying Plaintiffs Center for Biological Diversity and Maricopa Audubon Society's Motion for Leave to File Supplemental Complaint. (Doc. 88).

**IT IS FURTHER ORDERED** that if Plaintiffs bring a new action challenging the FWS's 12-month finding, it shall be assigned to the undersigned for purposes of judicial economy.

DATED this 30th day of September, 2010.

_____
Mary H. Murguia
United States District Judge